## No. 13-1610

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

————————————

ANGELEX LTD., as owner of the M/V ANTONIS G. PAPPADAKIS, and the M/V
ANTONIS G. PAPPADAKIS *in rem*,

Petitioners-Appellees,

v.

UNITED STATES OF AMERICA,
UNITED STATES COAST GUARD, and
UNITED STATES CUSTOMS AND BORDER PROTECTION AGENCY,

Respondents-Appellants.

————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

————————————

**REPLY BRIEF FOR THE UNITED STATES**

————————————

STUART F. DELERY
  *Acting Assistant Attorney
  General*

NEIL H. MACBRIDE
  *United States Attorney*

DOUGLAS N. LETTER
MATTHEW M. COLLETTE
ANNE MURPHY
  *(202) 514-3688
  Attorneys, Appellate Staff
  Civil Division, Room 7644
  U.S. Department of Justice
  950 Pennsylvania Ave., N.W.
  Washington, D.C. 20530*

# TABLE OF CONTENTS

**<u>Page</u>**

INTRODUCTION AND SUMMARY .................................................................1

ARGUMENT ..............................................................................................6

I.    Congress has made clear that there can be no judicial review of departure clearance conditions the Coast Guard offers when a vessel is under criminal investigation for MARPOL violations ...........................................6

II.   33 U.S.C. § 1908, by its plain terms, gives the Coast Guard discretion to set departure conditions that require a vessel's owner and operator to answer criminal charges in the United States after the vessel has left port ......................................................14

CONCLUSION ...........................................................................................24

CERTIFICATE OF COMPLIANCE WITH
FEDERAL RULE OF APPELLATE PROCEDURE 32(A)

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                              <u>**Page**</u>

*Amstar Corp. v. S/S Alexandros T.,*
  664 F.2d 904 (4th Cir. 1981) ................................................................ 15

*Clear Sky Car Wash v. City of Chesapeake, VA,*
  __ F. Supp. 2d __, 2012 WL 6607142 (E.D. Va. 2012) ......................... 12

*Darby v. Cisneros,*
  509 U.S. 137 (1993) ................................................................... 11, 12

*Gardner v. Baltimore Mayor & City Council,*
  969 F.2d 63 (4th Cir. 1992) ........................................................... 9

*Gerard Construction, Inc. v. M/V VIRGINIA,*
  480 F. Supp. 488 (W.D. Pa. 1979) ................................................. 16

*Holland v. Big River Minerals Corp.,*
  181 F.3d 597 (4th Cir. 1999) ........................................................ 17

*Love v. Pepersack,*
  47 F.3d 120 (4th Cir. 1995) ........................................................... 9

*Malbon v. Pennsylvania Millers Mut. Ins. Co.,*
  636 F.2d 936 (4th Cir. 1980) ......................................................... 9

*McDonald v. Centra, Inc.,*
  946 F.2d 1059 (4th Cir. 1991) ...................................................... 12

*Reiter v. Sonotone Corp.,*
  442 U.S. 330 (1979) ...................................................................... 16

*In re Total Realty Management, LLC,*
  706 F.3d 245 (4th Cir. 2013) ........................................................ 16

*United States v. Jho,*
    534 F.3d 398 (5th Cir. 2008) .................................................. 3

*United States v. Kassian Maritime Navigation Agency,*
    Crim. No. 7-48 (M.D. Fla. 2007) .......................................... 22

*United States v. Katsipis,*
    Crim. No. 13-70 (E.D. Va.) ................................................... 19

*Volvo GM Heavy Truck Corp. v. U.S. Dept. of Labor,*
    118 F.3d 205 (4th Cir. 1997) ........................................... 12, 13

**Statutes:**

5 U.S.C. § 701(a)(1) ................................................................ 6

5 U.S.C. § 701(a)(2) ................................................................ 6

5 U.S.C. § 704 ........................................................................ 9

33 U.S.C. § 1907 .................................................................. 14

33 U.S.C. § 1908 .................................................................. 14

33 U.S.C. § 1908(a) .......................................................... 3, 21

33 U.S.C. § 1908(d) .............................................................. 18

33 U.S.C. § 1908(e) ........................................... 3, 4, 6, 8, 10,
                                                                    13, 15, 16

33 U.S.C. § 1910(a)(2) ........................................................... 6

33 U.S.C. § 1910(b)(2) ........................................................... 6

46 U.S.C. § 3201(2)(B) ......................................................... 21

46 U.S.C. § 3203(a)(1)............................................................21

46 U.S.C. § 3203(a)(2)............................................................21

**Regulations:**

33 C.F.R. § 96.240(b), *et seq* ....................................................21

**Other Authorities:**

MARPOL, 1340 U.N.T.S. 61 (Feb. 17, 1978).............................................2

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

No. 13-1610

———————————

ANGELEX LTD., as owner of the M/V ANTONIS G. PAPPADAKIS, and the M/V
ANTONIS G. PAPPADAKIS *in rem*,

Petitioners-Appellees,

v.

UNITED STATES OF AMERICA,
UNITED STATES COAST GUARD, and
UNITED STATES CUSTOMS AND BORDER PROTECTION AGENCY,

Respondents-Appellants.

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

———————————

**REPLY BRIEF FOR THE UNITED STATES**

———————————

## INTRODUCTION AND SUMMARY

This case presents critical issues concerning the United States'
ability to hold the owners and operators of foreign vessels accountable
for crimes they commit here, and to vindicate international and
domestic laws designed to end deliberate pollution of the oceans. The
M/V ANTONIS G. PAPPADAKIS is still in port in Norfolk because she
arrived in the United States with clear evidence that her crew had

violated international law while at sea by discharging oily water directly into the ocean, and had committed a crime upon arrival by presenting false papers to the United States Coast Guard.

As a signatory to MARPOL, a multilateral treaty negotiated among many nations to "achieve the complete elimination of international pollution of the marine environment by oil and other harmful substances," MARPOL, 1340 U.N.T.S. 61, 128 (Feb. 17, 1978),[1] the United States has an international law obligation to take effective action to detect and prosecute such crimes. MARPOL specifically requires member States to prohibit violations of the treaty under domestic law, and to provide penalties "adequate in severity to discourage violations" of MARPOL, MARPOL, Art. 4(4), 1340 U.N.T.S. at 186, so that the oceans of the world may be safeguarded for future generations.

To that end, Congress has made it a crime, as a matter of the United States' domestic law, to present a falsified Oil Record Book to

---

[1] "MARPOL" is the term commonly used to refer to two international conventions, the 1973 International Convention for the Prevention of Pollution from Ships (Nov. 2, 1973), and the Protocol of 1978 Relating to the International Convention for the Prevention of Pollution from Ships.

2

the Coast Guard upon entering port.  33 U.S.C. § 1908(a); see generally, *e.g.*, *United States v. Jho*, 534 F.3d 398, 403-406 (5th Cir. 2008).   And Congress has given the government the means to hold foreign corporations and individuals accountable when they violate U.S. criminal law, even though the vessels they operate are present in the United States only briefly as they pursue their international voyages.

Thus, Congress has specifically authorized the government to keep a ship in port "if reasonable cause exists to believe that the ship, its owner, operator or person in charge may be subject to a fine or civil penalty" for violating MARPOL.  33 U.S.C. § 1908(e).  And there is no question that "reasonable cause" existed here.  Acting on a credible report from a crew member, the Coast Guard discovered in its investigation that the PAPPADAKIS arrived in Norfolk with pollution control equipment that the crew was unable to operate, with oily water on the *discharge* side of the oily water separator, with oil in her marine sanitation system, where no oil should have been present at all, and with entries in her Oil Record Book that appeared to be false.  In the face of this compelling evidence, the Coast Guard directed the port authorities to withhold the PAPPADAKIS's departure clearance.

Angelex here asks this Court to allow it to thwart the efforts of the United States to require the owner and operator of the PAPPADAKIS to answer criminal charges in court. But the governing statute does not require the United States to grant departure clearance to the PAPPADAKIS. Rather, "[c]learance *may* be granted upon the filing of a bond or other surety satisfactory to the Secretary" of Homeland Security while the criminal proceedings move forward. 33 U.S.C. § 1908(e). As we demonstrated in our opening brief, the statute commits departure conditions to the discretion of the Secretary, and the district court erred in usurping the Coast Guard's authority by asserting jurisdiction in this case and replacing the agency's conditions with those set by the court.

Notwithstanding the unambiguous language of the statute, Angelex asserts not only that a court can second-guess the Coast Guard's exercise of discretion with respect to departure clearance, but also that the ship owner has an absolute right to such clearance upon the posting of a bond (in an amount set by the court) – and that the government can impose no additional conditions upon the vessel's departure.

Indeed, Angelex essentially asks this Court to sanction a blueprint for evading the statute and allowing vessel owners and operators to flee the jurisdiction without answering for their conduct in polluting the seas. Its view of legitimate conditions under Section 1908(e) is even more constricted than the view adopted by the district court. The district court was persuaded that if the ship's clearance is withheld due to a suspected MARPOL violation by the operator, the corporate ship owner could require the government to grant departure clearance upon the posting of a bond based solely upon the owner's potential liability, and the ship – and its operator – can sail out of the reach of U.S. law. On this basis, an operator could set up a separate corporation to take ownership of the ship (as that corporation's only asset) and use that arrangement to avoid liability.

But Angelex's brief goes even further, and asserts that the government must accept a monetary bond and allow a ship to depart without any agreement by either her owner or her operator to face the criminal charges in the United States. As we discuss below, Congress did not intend to leave the United States so powerless to enforce its

anti-pollution laws against foreign companies that operate

international cargo vessels trading in the Nation's waters.

## ARGUMENT

I.    CONGRESS HAS MADE CLEAR THAT THERE CAN BE NO JUDICIAL REVIEW OF DEPARTURE CLEARANCE CONDITIONS THE COAST GUARD OFFERS WHEN A VESSEL IS UNDER CRIMINAL INVESTIGATION FOR MARPOL VIOLATIONS.

**A.** Congress made abundantly clear when it gave the Coast Guard

discretion to allow vessels to leave the United States under conditions

"satisfactory to the Secretary," 33 U.S.C. § 1908(e), that the Coast

Guard's offer of departure conditions would not be subject to judicial

review. As we showed in our opening brief (at 32-41), review under the

Administrative Procedure Act (APA) is unavailable because another

statute precludes judicial review, and because the determination

whether to provide departure clearance (and under what conditions) is

committed to agency discretion by law. 5 U.S.C. § 701(a)(1), (a)(2).

The statute here authorizes judicial review for the alleged failure

to perform any non-discretionary act or duty, 33 U.S.C. § 1910(a)(2), but

expressly bars review if the United States has "commenced enforcement

or penalty action" and "is conducting such procedures diligently." *Id.*

§ 1910(b)(2). Angelex has no answer to this express preclusion of

6

judicial review – and makes no attempt in its appellate brief to address the statutory text.  Instead, Angelex asserts that there is a presumption against preclusion of judicial review, and repeats, in various contexts, its view that Congress could not have intended to deprive the courts of an opportunity to review actions by the Coast Guard that, in the view of Angelex, exceed the Coast Guard's authority.  Angelex.Br. 33-36, 38-39.

A belief that government action *should be* subject to judicial review is no substitute for legal argument explaining where or how Congress actually did make judicial review available.  In other words, Angelex's complaint is actually against the decision of Congress to decline to make the Coast Guard's action here reviewable; Angelex is thus in the wrong forum – its remedy lies in the political arena, not before the courts.

Nor does Angelex provide any legal argument to support its view that the Coast Guard's decision here is not committed to the agency's discretion by law.  See *id.* at 30-36.  Angelex never comes to grips with the plain language of the statute, which requires that departure clearance be withheld and then states that clearance "may" (not must)

be granted on the posting of a bond or surety "satisfactory to the Secretary." 33 U.S.C. § 1908(e).

Angelex instead attempts to invoke the principle that even actions committed to the agency's discretion may be reviewed if they are far outside the scope of the agency's statutory authority, or are unconstitutional. See generally U.S.Br. at 40-41 (describing the exception). But while this exception makes clear that Angelex's hypothetical situations of a supposed "logical extreme" (Angelex.Br. 34 n.24) would not necessarily be immune from judicial review, that exception plainly is inapplicable here. Notwithstanding the lofty principles Angelex seeks to invoke, this case is nothing more than a direct review of the specific conditions sought by the Coast Guard in order to allow departure – and the district court's decision to usurp the Coast Guard's authority with a new set of departure conditions imposed by the court.

Moreover, Angelex does not identify any specific "statutory or constitutional command" (Angelex.Br. 32) that has been violated here. Although Angelex posits a theory that the Coast Guard is limited to accepting a monetary bond and therefore exceeds its authority in

8

seeking additional conditions, Angelex nowhere points to any statutory language so limiting the agency's authority. And as we explain below (Section II.D, *infra*), the conditions the Coast Guard has requested fall squarely within its authority under Section 1908(e).

Finally, Angelex's attempt to hinge a right to review on a supposed due process argument overlooks the fact that Angelex did not assert a due process claim in its petition for review in the district court. See JA 6-30; see generally *Malbon v. Pennsylvania Millers Mut. Ins. Co.*, 636 F.2d 936, 941 (4th Cir. 1980). In any event, the argument is meritless; among other things, a Coast Guard offer of security conditions, which is entirely discretionary, cannot create a property right entitled to due process protection. See, *e.g. Love v. Pepersack*, 47 F.3d 120, 123 (4th Cir. 1995) ("'Any significant discretion conferred upon the * * * agency defeats the claim of a property interest.'") (quoting *Gardner v. Baltimore Mayor & City Council*, 969 F.2d 63, 68 (4th Cir. 1992)).

Angelex further provides no persuasive argument in support of its view that the Coast Guard's offer of departure conditions is "final agency action" reviewable under the APA. 5 U.S.C. § 704. Angelex's

theory of final agency action is staggering in its breadth. If, as Angelex argues, an offer or negotiating position becomes final agency action once the parties reach an impasse, it is difficult to see what would *not* be final agency action.  Angelex would place the existence of "final agency action" in the hands of a third party, which need only reject the agency's offer to force judicial review.  Indeed, Angelex's insistence in this case that the Coast Guard had taken a firm, final position in the negotiations for surety "satisfactory to the Secretary," 33 U.S.C. § 1908(e), see *e.g.*, Angelex.Br. at 21, ignores the vessel interests' refusal to agree that Kassian (the ship's operator) would be available to answer the criminal charges if the ship were to leave, or to set bond at an amount that took into account Kassian's resources.

The Coast Guard is under no obligation to accept as "satisfactory" surety conditions that are inadequate to meet the public interest in ensuring that foreign individuals and entities are available to answer charges of crimes committed in the United States.  And as our opening brief explained, vessel interests have a practical reason to withhold their consent to reasonable and important conditions, if they are seeking to persuade a court that the Coast Guard's position in

negotiations is "final agency action" subject to judicial review.   The

Coast Guard remained here willing to negotiate in good faith for

reasonable conditions, and the offer in place when Angelex sought relief

in court was not "final agency action" subject to APA review.

Angelex devotes much of its discussion of the APA to defending

the district court's view that five exceptions to the administrative

exhaustion requirement, identified by the district court, have been met.

See Angelex.Br. at 23-30.  This argument is largely beside the point

because, even if Angelex had exhausted its administrative remedies –

and it has not, see U.S.Br. at 43-45 – the Coast Guard's offer of surety

conditions would still not be subject to judicial review, see *id.* at 44 n.13,

and this suit would still be precluded by the statutory bar and

Congress's decision to commit surety conditions to the Coast Guard's

discretion by law.

More fundamentally, Angelex confuses two related, but quite

distinct, concepts: the "final agency action" requirement and the

doctrine of exhaustion of administrative remedies.  See *Darby v.

Cisneros*, 509 U.S. 137, 144 (1993) ("We have recognized that the

judicial doctrine of exhaustion of administrative remedies is

11

conceptually distinct from the doctrine of finality").  The "five exceptions" cited by Angelex were designed to apply in cases in which the exhaustion doctrine "acts as a *prudential* rule . . . ."  *McDonald v. Centra, Inc.*, 946 F.2d 1059, 1063 (4th Cir. 1991) (emphasis supplied).  Thus, even if one of the exceptions applied, it cannot create "final agency action" where none exists.

In an APA case, exhaustion is not a prudential rule subject to judicially created exceptions.  Rather, "Congress effectively codified the doctrine of exhaustion of administrative remedies in [the APA]."  *Darby*, 509 U.S. at 153; see *id*. at 147 (noting that the APA "explicitly requires exhaustion of all intra-agency appeals mandated either by statute or by agency rule"); *Volvo GM Heavy Truck Corp. v. U.S. Dept. of Labor*, 118 F.3d 205, 209 (4th Cir. 1997) (quoting *Darby*).  Accordingly, the five discretionary exceptions are irrelevant here – a fact recognized by the decision that the district court invoked as establishing the exceptions.  See *Clear Sky Car Wash v. City of Chesapeake, VA,* __ F. Supp. 2d __, 2012 WL 6607142 *14 (E.D. Va. 2012) (holding that a claim that administrative procedures would be futile "addresses not whether there is agency action before the Court for review, but instead whether

Plaintiff may excuse their failure to exhaust" administrative remedies, and concluding that "[p]laintiff's failure to exhaust remedies is largely irrelevant" because there was no final agency action); see also *Volvo GM*, 118 F.3d at 212 ("Volvo GM has not pointed to any case, *involving a challenge under the APA*, since *Darby*, that has subjected the exhaustion requirement to judicial discretion.").

**B.**  Angelex's defense of the district court's assertion of maritime jurisdiction confirms that this case does not fall within the admiralty jurisdiction of the federal courts.  Angelex insists that an ordinary vessel arrest has occurred, that it has an "absolute right" to post bond for the release of the PAPPADAKIS, and that the case is governed by Supplemental Rule E of the Admiralty Rules.  Angelex.Br. at 41-43.  Angelex's view is flatly contradicted by the controlling statute.  As the courts have uniformly held, see U.S.Br. at 48-49, the withholding of a departure clearance under Section 1908(e) is legally unlike a vessel arrest.  Far from having a "right" to post bond, Angelex can be granted permission to depart, under acceptable conditions, only at the Coast Guard's discretion.  See 33 U.S.C. § 1908(e).

Finally, Supplemental Rule E has nothing to do with this case because the PAPPADAKIS has not been arrested.  While the Coast Guard's proposed surety conditions include a standard provision for any claim brought against the vessel *in rem* under 33 U.S.C. § 1907, see Angelex.Br. at 42-43, the Coast Guard  here has not exercised its authority under that provision.

## II.    33 U.S.C. § 1908, BY ITS PLAIN TERMS, GIVES THE COAST GUARD DISCRETION TO SET DEPARTURE CONDITIONS THAT REQUIRE A VESSEL'S OWNER AND OPERATOR TO ANSWER CRIMINAL CHARGES IN THE UNITED STATES AFTER THE VESSEL HAS LEFT PORT

In light of the lack of jurisdiction to review the Coast Guard's actions here, this Court need go no further.  In any event, the district court, despite imposing its own set of non-monetary conditions for release of the vessel, erroneously held that Section 1908 authorizes the Coast Guard to impose only monetary departure conditions.  Angelex goes even further, contending that that it has an absolute *right* to release of the vessel upon the posting of a bond.  These contentions are incorrect.

**A.**  The contention that Angelex has a right to release of the PAPPADAKIS upon posting a bond (Angelex.Br. at 41) cannot be

14

squared with the plain text of Section 1908(e).  The first sentence of

that provision makes quite clear that:

> [I]f reasonable cause exists to believe that [a] ship [subject to MARPOL], its owner, operator, or person in charge may be subject to a fine or civil penalty under this section, the Secretary of the Treasury, upon the request of the Secretary, *shall refuse or revoke* the [vessel's departure] clearance * * *.

33 U.S.C. § 1908(e) (emphasis added).  Congress in Section 1908(e)

made clear that the Coast Guard has authority to revoke a vessel's

clearance to leave the United States where there is reasonable cause to

believe that environmental crimes have been committed on board.

Nor does the statute require the Coast Guard to release the vessel:

"[c]learance *may* be granted upon the filing of a bond or other surety

satisfactory to the Secretary."  33 U.S.C. § 1908(e) (emphasis added).

Angelex would convert the statutory "may" to "must," and "satisfactory

to the Secretary" to "satisfactory to the district court."  Neither

argument is consistent with the statute enacted by Congress.  Thus, it

is not surprising that the cases Angelex cites for the asserted right to

clearance involve private disputes that do not implicate Section 1908(e).

*See, e.g., Amstar Corp. v. S/S Alexandros T.*, 664 F.2d 904, 912-13 (4th

Cir. 1981) (action to recover damages for losses from delivery of goods in

damaged condition); *Gerard Construction, Inc. v. M/V VIRGINIA*, 480

F. Supp. 488, 490-91 (W.D. Pa. 1979) (*in rem* action seeking to recover

balance due on sale of fuel and oil).

**B.**  There is no merit to Angelex's view that when Congress

authorized the Coast Guard to allow vessels to leave the United States

while criminal proceedings move forward, the agency could impose only

monetary conditions.  See Angelex.Br. at 45-49.  Contrary to Angelex's

position, nothing in Congress's authorization to the Coast Guard to

accept a "bond or other surety satisfactory to the Secretary," 33 U.S.C.

§ 1908(e), limits the "other surety" to other forms of monetary bond.

Nor is it an inflexible rule that "or" in a statute must be construed as a

rigid disjunctive, and here Congress had ample grounds to authorize

both monetary and non-monetary conditions.  See generally *Reiter v.

Sonotone Corp.*, 442 U.S. 330, 338-39 (1979) (a disjunctive construction

may be inapt in a particular context).

Moreover, Angelex's view of the second sentence of Section 1908(e)

disregards the first sentence.  See generally *In re Total Realty

Management, LLC*, 706 F.3d 245, 251 (4th Cir. 2013) (a court must

interpret a statute in light of "'the specific context in which that

16

language is used, and the broader context of the statute as a whole'")

(quoting *Holland v. Big River Minerals Corp.*, 181 F.3d 597, 603 (4th

Cir. 1999)).  Congress in Section 1908(e) first authorized the Coast

Guard to keep a vessel in port indefinitely if there were reasonable

grounds to believe MARPOL violations had been committed aboard.  In

granting the Coast Guard authority, in the alternative, to establish

departure clearance conditions for the vessel, Congress would hardly

have limited the Coast Guard to conditions that are not an adequate

substitute for the vessel's presence in port.  A monetary bond that the

United States cannot recover if it fails to secure a criminal conviction

cannot amount to a satisfactory surety when the vessel sails, unless the

United States can also include surety conditions that provide it the

means necessary to pursue criminal proceedings, such as jurisdiction

over the criminal defendants.

   **C.**  Angelex is also mistaken in contending that the Coast Guard's

statutory authority to detain the PAPPADAKIS is limited to allowing

the government to realize any monetary penalty from the vessel, *in rem,*

without securing jurisdiction over her owner and operator in the

criminal case.  See Angelex.Br. at 11.  The Act to Prevent Pollution from

17

Ships ("APPS"), implementing MARPOL, provides that a "ship operated in violation of the MARPOL Protocol * * * is liable in rem for any fine imposed," 33 U.S.C. § 1908(d), but the Coast Guard has not invoked its Section 1908(d) authority in this case. As discussed earlier, the PAPPADAKIS has not been arrested and the Coast Guard has made no penalty claims against the vessel *in rem*.[2] Rather, the Coast Guard has exercised its separate authority under Section 1908(e) to withhold the vessel's departure clearance and keep her in a United States port. That authority is not limited to securing a criminal fine. Rather, it allows the United States to hold foreign vessel operators answerable for crimes they may commit in United States ports.

Further, Angelex is incorrect in its contention that allowing the Coast Guard to negotiate with vessel interests for satisfactory security conditions would "impose a pre-judgment, non-recourse penalty on the vessel owner and operator * * *." Angelex.Br. at 10 n.9. To the contrary, a surety arrangement benefits the vessel by allowing her to

---

[2] As we explained in Section I.B. above, Angelex's contention that the district court had maritime jurisdiction to review the clearance conditions is predicated upon the same incorrect assumption that the Coast Guard is proceeding against the PAPPADAKIS *in rem*.

18

continue trading while the criminal proceedings in the United States move forward. Moreover, a primary purpose of the bond is to provide funds to pay any penalty ultimately awarded against the vessel. Without a judgment of conviction (after a criminal trial governed by the Constitution of the United States), the owner and operator will never make the payment secured by the bond.

**D**. In light of the plain language of the statute, this case does not require judicial inquiry into the reasonableness of the departure conditions proposed by the Coast Guard. In any event, as we pointed out in our opening brief, those conditions are both reasonable and necessary. We nevertheless wish to correct two mistaken premises in Angelex's brief.

First, the conditions proposed by the Coast Guard do not result in the crew of the PAPPADAKIS being "detained" (Angelex.Br. at 17 & n.14, 27 n.21). Crew members who come ashore as a result of the criminal investigation either remain voluntarily or, alternatively, are kept by an arrest warrant or a material witness summons. Here, an arrest warrant was issued for the chief engineer. See *United States v. Katsipis*, Crim. No. 13-70 (E.D. Va.) (Arrest Warrant, ECF Nos. 7 & 9).

19

Material witness summonses were issued to five other witness crew members, in large part because Angelex deposited them on shore with no money, and the United States can pay material witnesses a small daily fee of $40.[3]  The vessel has provided counsel for its chief engineer and, at the United States' request, independent counsel, through the Federal Public Defender, have been appointed for the regular crew witnesses.  Primarily through the government's efforts, the basic needs of the PAPPADAKIS crew members who remain in Norfolk are being met.

Second, despite Angelex's contention to the contrary, it is neither unusual nor unlawful for the Coast Guard to condition release of a vessel on an agreement of the operator to submit to U.S. criminal jurisdiction.  Angelex's contention (Angelex.Br. at 11 n.10) that the U.S. does not have jurisdiction over the operator while the PAPPADAKIS is in Norfolk is wrong.

---

[3] For this reason, the United States insists upon adequate provision for crew members as a condition for a vessel's departure, and is willing to reduce the amount of a bond in exchange for better conditions for the crew.  The departure conditions the district court imposed here unfortunately failed to make adequate provision for the crew members left in Norfolk.  See U.S.Br. at 54-55.

20

While the vessel remains in Norfolk, the United States has jurisdiction in the criminal case over both Angelex and Kassian. Both are subject to the jurisdiction of the criminal court because both have been indicted for committing crimes in Eastern Virginia. Both are "person[s]" under 33 U.S.C. § 1908(a) that can be held liable for criminal violations of APPS. Angelex, the owner of the PAPPADAKIS, has named Kassian as the "responsible party" for ensuring that the vessel complies with international safety and environmental standards. JA 540 (International Safety Management Code Declaration by Angelex); JA 468 (Maltese records showing Kassian as the PAPPADAKIS's "International Safety Management Company"); see generally 46 U.S.C. § 3201(2)(B) (a company other than the owner can be named a "responsible party"); *id.* § 3203(a)(1),(2) (requiring procedures for "protection of the environment in compliance with international and United States law"); 33 C.F.R. § 96.240(b), *et seq.* (implementing regulations); JA 592 (vessel management certificate showing Kassian as the "Company" responsible for safety and pollution prevention aboard the PAPPADAKIS).

21

As the corporation legally responsible for the PAPPADAKIS's compliance with MARPOL, Kassian cannot evade criminal liability for MARPOL violations on either the legally irrelevant ground that it has no "proprietary interest in the Vessel," Angelex.Br. 5 n.2, or the fictitious ground that it "does not employ any of the crewmembers on board," *ibid.*[4] Kassian, in 2007, pleaded guilty in the United States to the same crimes, under the same laws, in materially identical circumstances.[5] Kassian is "not a party to this [civil] case," Angelex.Br. at 5, because its counsel chose not to make it a petitioner. While Kassian has every right to contest jurisdiction in the current criminal case, as it now has, see Angelex.Br. at 5 n.2., the Coast Guard has an

---

[4] Kassian, on behalf of Angelex, employs and manages the crew. See JA 582 (Master's employment contract); JA 587 (First Engineer's employment contract), both filed in district court among Kassian's financial documents, not Angelex's, see JA 463.

[5] See *United States v. Kassian Maritime Navigation Agency*, Crim. No. 7-48 (M.D. Fla. 2007), docket entry 120 (plea agreement), describing Kassian's criminal violations of MARPOL and APPS as operator of the M/V NORTH PRINCESS. The NORTH PRINCESS is another vessel in what Kassian describes as its "fleet." See http://www.kassian.gr/our_fleet; see also http://www.kassian.gr/company_profile/our_history. Each vessel in the Kassian fleet, however, is owned by a separate company. See JA 543-44; see also JA 489 (the ownership companies pay Kassian fees both for services rendered to their specific vessel, and for services that are spread among the Kassian fleet).

equal right to impose conditions upon the PAPPADAKIS's departure from Norfolk that include an agreement by Kassian to answer the criminal charges against it.

Contrary to Angelex's contentions, therefore, it cannot insist that the Coast Guard allow the PAPPADAKIS to leave the United States if it simply posts a monetary bond, without agreeing to answer the charges in the criminal case, or to any other security condition. Congress enacted legislation that authorizes the Coast Guard both to keep vessels in port while criminal prosecutions are in progress, and in its discretion to set conditions for their departure that will allow those who violate United States law, in the United States, to be held accountable here.

## CONCLUSION

For the foregoing reasons and for the reasons given in our opening brief, the judgment of the district court should be reversed and this case dismissed.

Respectfully submitted,

STUART F. DELERY
  *Acting Assistant Attorney*
  *General*
NEIL H. MACBRIDE
  *United States Attorney*
DOUGLAS N. LETTER
MATTHEW M. COLLETTE

 s/Anne Murphy
ANNE MURPHY

  *(202) 514-3688*
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7644*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave., N.W.*
  *Washington, D.C.  20530*

JUNE 2013

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(A)

I hereby certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Century Schoolbook, a proportionally spaced font.

I further certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains **4,483 words**, excluding the parts of the brief exempted under Rule 32(a)(7)(B)(iii), according to the count of Microsoft Word.

  s/Anne Murphy
ANNE MURPHY

**CERTIFICATE OF SERVICE**

I hereby certify that on June 14, 2013, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. I further certify that I will cause 8 paper copies of this brief to be filed with the Court by overnight mail.

The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

s/Anne Murphy
ANNE MURPHY